**PADRON WAREHOUSE CORP., a Florida corporation, Plaintiff,**

**v.**

**THE REALTY ASSOCIATES FUND III, L.P., doing business in Florida as the Realty Associates Fund III, Limited Partnership, a Delaware limited partnership, and Cecilio J. Padron, an individual, Defendants.**

No. 02–20181–CIV–JORDAN.

United States District Court,
S.D. Florida,
Miami Division.

. July 14, 2005.

Alexander Kapetanak is for plaintiff.

Christopher S. Carver and Scott B. Cosgrove for defendant The Realty Associates Find III. L.P.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT
AND DEFAULT JUDGMENT

JORDAN, District Judge.

Padron Warehouse Corporation ("PWC") initiated the instant suit against defendants Cecilio Padron and The Realty Associates Fund III ("Realty") for the return of what was formerly PWC's sole asset—a 207,000 square-foot warehouse and real property located at 5501 N.W. 72nd Street, Miami, Florida ("the warehouse"). Amended Complaint at ¶¶ 1, 28. [D.E. 38]. PWC generally alleges that Mr. Padron and Realty conspired to sell the property without informing PWC's minority shareholders, and without obtaining the necessary consent of his then-wife and PWC shareholder, Mary Angel Padron, so that Mr. Padron could personally retain all profits from the sale and so that Realty could buy the warehouse at a below-market price. Id. at ¶ 27.

Realty now moves for summary judgment on all of PWC's claims. It also moves for summary judgment on liability on its breach of contract counterclaim, arguing that, should it prevail in this suit, it is entitled to indemnification from PWC for attorneys' fees and costs in this action and a prior action brought by Ms. Padron. For its part, PWC moves for default judgment against Mr. Padron, who was served with the initial complaint but not the amended complaint.

For the reasons set forth below, Realty's motion for summary judgment [D.E. 84] on PWC's claims is GRANTED. With respect to Realty's motion for summary judgment on liability on its breach of contract counterclaim, that motion [D.E. 127] is GRANTED in part and DENIED in part. Realty is entitled to recover its reasonable attorneys' fees and costs from PWC in this case, but not in the prior action brought by Ms. Padron. PWC's motion for default judgment against Mr. Padron [D.E. 156] is DENIED, because Mr. Padron was never served with the amended complaint, as required by Eleventh Circuit precedent,

and because the only relief requested against Mr. Padron—the return of the warehouse—is relief that cannot be awarded against Mr. Padron, as he is not in possession and does not hold title.

### I. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that might affect the outcome of the case. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is appropriate. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1225 (11th Cir.1999). Thus, the task is to determine whether, considering the evidence in the light most favorable to PWC, the non-moving party, there is evidence on which a trier of fact could reason-ably find a verdict in its favor. See *Hilburn*, 181 F.3d at 1225; *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

### II. RELEVANT FACTS

The facts are taken from the parties' statements of material facts, the depositions filed by the parties, and the exhibits in the record. Where there is a genuine dispute, I credit PWC's version, and note Realty's position. I say genuine dispute because, as indicated below, some of the critical facts relied upon by PWC are not supported by the evidence in the record[1] or are based on inadmissible hearsay.[2] I discuss them, however, to explain why they are deficient.

**PWC.** PWC was incorporated in late 1992. The articles of incorporation provided, in relevant part, as follows: (1) voting power "for the election of directors and for all other purposes shall be vested exclusively in the holder of the outstanding common shares;" (2) the initial and sole director for PWC was Cecilio Padron; (3) special meetings could be called only by shareholders owning "not less than 10% of the capital stock;" (4) 51% of the shares entitled to vote, represented in person or by proxy, constituted a quorum; and (5) if

---

1. This is probably a good time to mention that PWC's "verified" statement of material facts [D.E. 116] is not verified in all respects. Ms. Padron has not verified, or sworn to, everything in that statement. Nor has anyone else. In her second affidavit, Ms. Padron has sworn that some of the information set forth in the statement is true. See Padron Aff. II at ¶ 6 [D.E. 118] ("The following paragraphs of the plaintiff's statement of undisputed facts are true and correct: 2, 3, 4, 5, 7, 17, 21, 22, and 23."). Accordingly, I will consider what is in PWC's statement so long as it is supported by admissible evidence in the record (including the admissible portions of Ms. Padron's affidavit).

2. For example, when asked about the alleged conspiracy involving Mr. Padron and Realty, Ms. Padron admitted she had no personal knowledge: "I can only tell you what Cecilio told me. I cannot state something that I saw directly because I wasn't there." Padron Depo. at 55. See also id. at 186 ("Q: You don't have any personal knowledge of the conspiracy between someone at Realty Associates and Mr. Padron? A: Someone at Realty who I can't identify a person, no."). The hearsay problems are discussed later in this order.

a quorum was present, the affirmative vote of 51% of the shares represented at the meeting and entitled to vote would be the act of the shareholders. *See* Realty Statement of Facts, Tab C.

The files of the Florida Department of State do not contain any amendments to the initial articles of incorporation. They also do not contain any bylaws or shareholders' agreements. *See id.*

Mr. Padron reinstated PWC in September of 1994. Ms. Padron reinstated PWC again in 2001. *See id.*

**The Postnuptial Agreement.** Cecilio Padron and Mary Angel Padron were married in 1992. Sometime in 1994, Ms. Padron filed for divorce. When she filed for divorce, Ms. Padron was not a shareholder in PWC. Padron Depo. at 33–40.

On November 4, 1994, after Ms. Padron filed for divorce, Mr. Padron and Ms. Padron, as part of an attempt towards reconciliation, entered into a postnuptial agreement that retitled the stock in PWC. Padron Depo. at 36. The sole asset of PWC was the warehouse which is the subject of this litigation.

The postnuptial agreement allotted 68% of the company's stock to Mr. Padron, 30% to Ms. Padron, and 2% to a third party, Felix Padron (Mr. Padron's brother). Amended Complaint, Ex. A at 3. The postnuptial agreement covered the fate of the Padrons' shares in the event of death or divorce but specified nothing else about the shareholders' respective powers and responsibilities within the company. *See id.* The postnuptial agreement did, however, contain a clause preventing either of the spouses from alienating PWC's warehouse without the other's consent: "Neither party shall, without the written consent of the other, enter into any contracts

regarding the sale, transfer, gift, etc., of [PWC's warehouse]." *Id.* at 4.

**The Alleged Shareholders' Agreement.** PWC alleges in its amended complaint that the postnuptial agreement is evidence of a prior shareholders' agreement that took effect sometime in 1994. Amended Complaint at ¶ 6. Under the agreement, PWC alleges, the company's shares were divided as represented in the postnuptial agreement. *Id.* PWC further alleges that the agreement stated that neither Ms. Padron nor Mr. Padron had authority to bind PWC to the sale of all its assets without the other's consent. *Id.* Significantly, however, the evidence in the record concerning the substance of the shareholders' agreement is not the same as what is alleged by PWC in the amended complaint.

In her deposition, Ms. Padron did not testify about the substance of the shareholders' agreement, save to say that the "postnuptial agreement evidences that there was a shareholders' agreement," and that the shareholders' agreement was "identified in the minutes of PWC's books and was made a part of the bylaws." Padron Depo. at 161, 162. She also testified that she did not have the originals, or copies, of the shareholders' agreement or the company's books (including the bylaws and minutes). *Id.* at 164–66. She testified that Mr. Padron told her that he lost those documents. *Id.* at 167.

Based on Ms. Padron's inability to produce documentation of the shareholders' agreement, Realty contends in its motion for summary judgment that no such agreement existed. Realty Statement of Facts at 6–7. Furthermore, Realty contends that, absent such an agreement, Ms. Padron lacked the authority to reinstate PWC in 2001. *Id.* at 7.

**Ms. Padron's Conflicting Affidavits.** On August 19, 2003, about six months after

her deposition was taken, and days before PWC responded to Realty's motion for summary judgment, Ms. Padron filed a stand-alone, three-paragraph affidavit that was executed on August 8, 2005 [D.E. 116]. I will refer to this as the first affidavit. In this first affidavit, Ms. Padron stated, among other things, the following:

> The document [the shareholders' agreement] gave me authority, in Cecilio's absence, to exercise full corporate powers and to manage the business and affairs of [PWC] is all respects with only one exception. *Written approval of both Cecilio Padron and Mary Angel Padron was required to sell or encumber the warehouse real property.*

Padron Aff. I at ¶ 1 (emphasis added).

On August 22, 2003, in conjunction with its response to Realty's motion for summary judgment, PWC filed several documents, including another affidavit (this one executed August 21, 2003) by Ms. Padron [D.E. 118]. In this second affidavit, which added three substantive paragraphs and corrected one of the dates in the first paragraph, Ms. Padron said something different about the shareholders' agreement:

> The document gave me the authority, in Cecilio Padron's absence, to exercise full corporate powers and to manage the business and affairs of [PWC] in all respects with a few exceptions, including selling or encumbering the property and transferring shares.

Padron Aff. II at ¶ 1.

The second affidavit, in contrast to the first, does not state that the shareholders' agreement required the written consent of both Mr. and Ms. Padron for sale of the warehouse. Rather, what the second affidavit says is that Ms. Padron, under the shareholders' agreement, could manage the company in Mr. Padron's absence and take all necessary action with the exception of encumbering the property and transferring shares. The second affidavit, in other words, talks about limits placed on *Ms. Padron's* authority to act for and on behalf of PWC during Mr. Padron's absence. Unlike the first affidavit, the second says nothing about whether Mr. Padron, under the shareholders' agreement, was prohibited from encumbering or selling the warehouse without Ms. Padron's consent.

The question, then, is what to do about these conflicting affidavits for purposes of summary judgment. Given that PWC and Ms. Padron have provided no explanation for the discrepancy between the two affidavits on what the shareholders' agreement said, that the first affidavit was filed by itself as a stand-alone document, and that PWC is relying only on the second affidavit in its memorandum, *see* PWC Memo. at 8 (quoting ¶ 1 of second affidavit), it seems to me that I should consider only the second affidavit, as it is more complete and was filed in conjunction with PWC's opposition to the motion for summary judgment. Another indication that the second affidavit is the one that controls is that second affidavit is the one in which Ms. Padron verified portions of PWC's statement of material facts.

Without the first affidavit (at least on the issue of what the shareholders' agreement said about consent to sell the warehouse), PWC is left without any evidence to create an issue of fact on whether Mr. Padron was obligated, under the shareholders' agreement, to obtain Ms. Padron's consent before selling the warehouse. Even if am wrong in choosing the second affidavit over the first, PWC still cannot create an issue of fact on this critical point

because at best the two affidavits conflict. "Two conflicting affidavits submitted by the same party do not preclude summary judgment," 11 J. Moore, Moore's Federal Practice ¶ 56.14[1][f], at 56–178 (3d ed.2004), and PWC has not provided any explanation for the discrepancy. *Cf. Tippens v. Celotex Corp.*, 805 F.2d 949, 953–54 (11th Cir.1986) (discussing sham affidavit rule).

**The 1995 Sale of the PWC Warehouse.**
In late 1994, real estate brokers Bob Sherman and William Johnson placed PWC's warehouse on the market for sale. Arce Depo. at 27 [D.E. 88]. *See* Amended Complaint at ¶ 28. Messrs. Sherman and Johnson contacted John Aibel to inquire whether his employer, a real estate developer, wanted to purchase the property. In turn, Mr. Aibel contacted another real estate broker Lorenzo Arce. Arce Depo. at 8–9; Whalen Depo. at 12 [D.E. 87]. Messrs. Aibel and Arce then contacted Jim Whalen, the acquisition manager for Realty, and inquired whether Realty would be interested in the property. *Id.* at 9; Whalen Depo. at 12. Mr. Arce subsequently assisted Mr. Whalen in formulating an offer for the warehouse. Whalen Depo. at 16. Realty submitted its first letter of intent on January 27, 1995. Realty Statement of Facts at 2; Arce Depo. at 21–22. On or about February 15, 1995, PWC and Realty reached an agreement as to the terms of the sale. Arce Depo. at 18.

On March 22, 1995, Mr. Padron signed an agreement of purchase and sale regarding the warehouse and a second property not at issue in this case. Realty Statement of Facts, Ex. 6 at 49, 72. The agreement listed PWC and C.J. Padron & Associates as sellers, Realty as the buyer, and the aggregate purchase price as $9.5 million. *Id.* at 45, 49. Separate documentation showed that the purchase price of the PWC warehouse was $4.75 million. *See* Smulian Depo., Ex. 4 at 1 [D.E. 114].[3]

On March 22, 1995, Mr. Padron also certified that, in compliance with Fla. Stat. § 607.1202, PWC held a meeting on March 27, 1995—supposedly five days after Mr. Padron signed the purchase and sale agreement—in which "all members of the board of directors and a majority of the shareholders" approved the terms of the March 22, 1995 agreement. PWC Statement of Facts, Ex. G at 1.

According to PWC, if the purchase and sale agreement was signed on March 22nd and the shareholders' meeting took place on March 27th, the minority shareholders could not have possibly have been given the required 10–day statutory notice under

---

**3.** PWC claims in its statement of facts that the sale price fell short of a 1994 appraisal of $5.9 million in Realty's possession, and cites to a document attached to its statement. The document, however, is completely blank, so there is no evidence supporting the allegations that there was a 1994 appraisal and that Realty had a copy of it. *See* PWC Statement of Facts at 3 & Ex. C (RAF 1238). Mr. Whalen did not recall getting an appraisal for the warehouse or reviewing one. Whalen Depo. at 29–30.

Ms. Padron did testify in her deposition that she believed that the warehouse was worth about $6 million—$6.2 million, but that testimony was based only on the $5.8 million sale price of a nearby warehouse. Padron Depo. at 137–39. This testimony was sheer speculation and not based on personal knowledge, as Ms. Padron admitted: "It's just my opinion. I am not a real estate agent." *Id.* at 138. Ms. Padron, moreover, merely "assume[d]" that someone at Realty knew the market value was around $6 million. *Id.* at 169. To the extent that Ms. Padron relied on what Mr. Padron told her concerning Realty's knowledge of such a value, *id.*, that testimony is inadmissible hearsay as to Realty (as explained later in the text).

Fla. Stat. § 607.1202. *See* Smulian Depo. at 24. Ms. Padron says she did not know about the sale until she learned of it after the fact from Realty representatives (as set forth below).

On March 30, 1995, Mr. Padron executed a warranty deed and blanket conveyance, the latter specifying as follows: "Seller represents, covenants and warrants that Seller is the sole and lawful owner of all the Assigned Property and that the Assigned Property is free and clear of all claims, liens, or encumbrances whatsoever .... Seller further represents, covenants and warrants that Seller has the full right, power and authority to execute the bill." Realty Statement of Facts, Tab A, Depo. Ex. 12 at RAF 111. Pursuant to the foregoing, a warranty deed was recorded on March 31, 1995. Smulian Depo., Ex. 2 at 1. Realty has been in possession of the property since that time, and holds title pursuant to the warranty deed. First Amended Complaint at ¶ 40; Realty Statement of Facts at 4.

Ms. Padron says that Mr. Padron "fled the country" with the proceeds of the sale and did not give her any of the proceeds. Padron Aff. II at ¶ 3; Padron Depo. at 98. Mr. Padron and Ms. Padron divorced in 1998. Padron Depo. at 33.

**What Realty Knew (Or Didn't Know) About the Shareholders' Consent (or Lack Thereof).** Realty contends that it purchased the warehouse under the assumption that Mr. Padron had authority to bind PWC to the sale. *See* Realty Statement of Facts at 4; Smulian Depo. at 34. Andrew Smulian, the attorney who represented Realty in the transaction, cannot recall whether he knew there were minority shareholders at the time of the sale, and does not recall requesting shareholder approval, beyond the certificate of compliance with § 607.1202. *See* Smulian Depo. at 4, 6, 8, 10, 24. Instead, Realty relied on Mr. Padron's signature of the purchase agreement, which represented that Mr. Pardon had authority to bind PWC. *Id.* at 3–4. Prior to signing the purchase agreement, Realty conducted its "standard due diligence," which included examining the building, determining whether the building could be profitably leased, and hiring counsel to perform title searches and the like. Realty Statement of Facts at 3.

One to three days after the closing on March 30, 1995, Realty representatives Fred Heltman and Alfredo Santurio hand delivered letters to all warehouse tenants, including Ms. Padron, informing them of new ownership. Heltman Depo. at 7–8 [D.E. 114]; Arce Depo., Ex. 20 at 1. Upon learning of the sale, Ms. Padron "was surprised and upset and stated that [the sale] shouldn't have happened, that she was part owner in the park." Heltman Depo. at 9; Arce Depo. at 39. Ms. Padron then retrieved what appeared to be a stock certificate, insisting that it was proof of her ownership, as well as the postnuptial agreement. *Id.;* Padron Depo. at 41. Messrs. Heltman and Santurio responded that they "didn't know anything about that." *Id.* Messrs. Heltman and Santurio informed Mr. Arce of Ms. Padron's reaction upon returning to their office. Arce Depo. at 40. The same day, someone from Mr. Arce's office informed Realty of Ms. Padron's objection to the sale. *Id.* at 41. At some later point Ms. Padron showed the post-nuptial agreement to Mr. Arce. Padron Depo. at 41. Messrs. Arce and Whalen deny having conspired with Mr. Padron concerning the sale of the warehouse. Arce Depo. at 50–51; Whalen Depo. at 12, 31, 35.

PWC contends that, after learning of Ms. Padron's objection, Realty discovered

that the deed recorded on March 31, 1995, was flawed because it lacked a signature on behalf of PWC and because it contained no description of the property conveyed. PWC Statement of Facts at 7. *See* Smulian Depo., Ex. 2 at 1–2. According to PWC, on or about April 11, 1995, Realty filed a corrected deed that included Mr. Padron's signature on behalf of PWC and a description of the property. PWC Statement of Facts at 7. *See* Sumulian Depo., Ex, 4 at 1–3. Neither the original deed nor the corrected deed contain PWC's seal. *Id.;* Smulian Depo., Ex. 2 at 1–2.

**Mr. Padron's 1998 Confession to Ms. Padron.** Realty contends that its brokers and attorneys had no direct contact with Mr. Padron during the negotiations that led to the February 15, 2005 agreement, and denies that it was involved in any conspiracy to improperly purchase the warehouse. Realty Statement of Facts at 3. As noted earlier, Ms. Padron does not have any personal knowledge or direct evidence that anyone from Realty conspired with Mr. Padron on the sale of the warehouse, and cannot identify any person from Realty who so conspired. Padron Depo. at 56. All she knows about Realty's alleged knowledge and involvement is what was Mr. Padron told her in 1998, Padron Depo. at 55, 56, which was the following: (1) the "buyers" (unnamed) conspired with Mr. Padron and Mr. Arce on the sale of the warehouse, with Mr. Arce giving Mr. Padron a $10,000 deposit "in secret" around Christmas of 1994;[4] (2) that Mr. Arce had conversations with people at Realty; (3) that Mr. Arce and Realty ("they"—no names mentioned) knew that Mr. Padron could not sell the warehouse without his wife's consent; and (4) that Mr. Arce said the price was a "steal." *Id.*

at 56–62. Significantly, Mr. Padron did not tell Ms. Padron that Messrs. Heltman and Santurio were involved in the conspiracy. *Id.* at 131.

Ms. Padron testified that, in November of 1998, Mr. Padron informed her, "more or less" that "Lorenzo Arce knew that [she] was a shareholder or owner and that [she] would not consent to the sale." Padron Depo. at 57. Mr. Padron added that the price was "a steal." *Id.* at 62–63. As for Realty, Ms. Padron recalls her exhusband telling her that "they knew" about her shareholder status, without specifying who "they" were. *Id.* at 59. Ms. Padron "assum[ed]" that Mr. Padron was referring to the buyers, but apparently she did not ask whether Realty in particular knew that she would have opposed the sale. *Id.* at 59–60. On the other hand, Ms. Padron also testified that Mr. Padron denies saying to her that he conspired with anyone to sell PWC's property, and that she considers Mr. Padron a liar. *Id.* at 34, 63–64, 168.

■ Although Florida law governs the substantive issues in this case, federal law controls the evidentiary issues. *See, e.g., Peat, Inc. v. Vanguard Research, Inc.,* 378 F.3d 1154, 1159 (11th Cir.2004). Mr. Padron's incriminating statements to Ms. Padron about his sale of the PWC warehouse without her consent and his absconding with the proceeds are admissible against him as the admission of a party opponent under Fed.R.Evid. 801(d)(2)(A). But any statements made by Mr. Padron to Ms. Padron about the alleged involvement or knowledge of Mr. Arce or Realty are not admissible against Mr. Arce or Realty to prove the truth of the matter asserted (i.e., that Mr. Arce and Realty

4. Ms. Padron "assumed" that Mr. Padron was referring to Realty. Padron Depo. at 59–60.

conspired with Mr. Padron to obtain the warehouse without Ms. Padron's consent). First, some of Mr. Padron's statements to Ms. Padron contain hearsay within hearsay (e.g., what Mr. Arce told Mr. Padron), and PWC has made no attempt to establish exceptions for either level of hearsay. Second, to the extent that PWC might argue that Mr. Padron's statements are admissible against Mr. Arce and Realty, any such argument would fail. Co-conspirator statements are generally admissible under Fed.R.Evid. 801(d)(2)(E), but only if they are made "during the course and in furtherance of a conspiracy." Here, Mr. Padron made his statements to Ms. Padron in 1998, about three years after the sale of the PWC warehouse was completed and after he had fled the country with the proceeds. In other words, the objectives of the conspiracy (from the view of both Mr. Padron and Realty, assuming for now that there was such a conspiracy) had long since been achieved, and the alleged conspiracy had long since ended. Furthermore, at the time he made the statements Mr. Padron was not trying to conceal the conspiracy or prevent detection—he was instead disclosing the alleged wrongful acts. Under these circumstances, Mr. Padron's statements are simply not admissible for their truth against Mr. Arce or Realty. *See generally Krulewitch v. United States,* 336 U.S. 440, 442, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (statement of one coconspirator implicating another co-conspirator is inadmissible if, when statement is made, "the central aim of the alleged conspiracy ... had long since ended in success or failure"). *Accord Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1120–21 (5th Cir.1980); *United*

*States v. Meacham,* 626 F.2d 503, 510 n. 8 (5th Cir.1980).

**Ms. Padron's Reinstatement of PWC.** PWC was administratively dissolved in 1995. In late 2001, days after her own personal lawsuit had been dismissed with prejudice,[5] and believing that reinstatement of the company was necessary this action, Ms. Padron filed an application to reinstate PWC. In the application, Ms. Padron certified that she was an officer or director of PWC. Ms. Padron, however, had never previously been an officer or director of PWC. Ms. Padron "elected" herself as president of PWC at a meeting where she was the only person in attendance and at which—under PWC's then-existing articles of incorporation—there was no quorum. Padron Depo. at 151–57.

## III. REALTY'S MOTION FOR SUMMARY JUDGMENT ON PWC'S CLAIMS

PWC's amended complaint contains four counts: Count I is a claim, under Fla. Stat. § 65.061, to quiet title of the warehouse in favor of PWC and to transfer possession of the warehouse to PWC; Count II is for a declaratory judgment that the sale of the warehouse to Realty was ineffective and that PWC is the rightful owner; Count III is for ejectment; and Count IV is for a constructive trust. Realty moves for summary judgment on all claims on various grounds.

### A. THE SHAREHOLDERS' AGREEMENT

██ PWC's claims against Realty are all based on the alleged shareholders' agreement, which supposedly prohibited Mr. Padron and Ms. Padron from selling

---

**5.** *See Padron v. The Realty Associates Fund III,* No. 01–1919–Civ–Jordan (dismissed with

prejudice on statute of limitations grounds).

the warehouse without the other's consent. If there was no such consent clause in the shareholders' agreement, PWC would have no claims as a corporation, for the sale by Mr. Padron would not have been prohibited as an intra-corporate matter, and the conveyance of the warehouse to Realty would have been perfectly proper.[6] .The sale by Mr. Padron would have been in violation of the post-nuptial agreement, but such a violation would only allow Ms. Padron, individually, to seek redress against Mr. Padron, as there is no evidence that the post-nuptial agreement was ever incorporated into PWC's bylaws or articles of incorporation, or that the post-nuptial agreement gave PWC, as a corporation, any rights against anyone.

As noted in the section on the facts, Ms. Padron's second affidavit does not say that the shareholders' agreement required either spouse to get the consent of the other before selling the warehouse. Instead, Ms. Padron says only that she was allowed to exercise full corporate powers and was authorized to act on behalf of PWC *in Mr. Padron's absence* on all matters, "with a few exceptions, including selling or encumbering the property and transferring shares." This is a limitation on Ms. Padron's authority to sell the warehouse, and not on Mr. Padron's. Accordingly, PWC has not presented admissible evidence to create an issue of fact as to whether Mr. Padron was, under the shareholders'

agreement, required to obtain the consent of Ms. Padron before selling the warehouse. Realty is therefore entitled to summary judgment on all of PWC's claims.[7]

In case I am wrong on this threshold question, and in case PWC has created an issue of fact about whether the shareholders' agreement contained a consent clause for sale of the warehouse, I address Realty's other arguments. *For purposes of Sections B, C, D, E, and F below, except as otherwise noted, I assume that PWC has presented sufficient evidence to allow a jury to find that the shareholders' agreement contained a clause requiring the consent of one. spouse before the other could sell the warehouse.*

### B. STATUTE OF LIMITATIONS

█ Realty argues that all of PWC's are based on Realty's alleged fraud (or conspiracy to defraud), and are therefore time-barred under Fla. Stat. § 95.11(3)(j) (four-year statute of limitations for a "legal or equitable action founded on fraud") because Ms. Padron knew of the allegedly improper sale in 1995 (seven years before this action was filed). According to Realty, the label attached to the claim is irrelevant, and it is clear that PWC is claiming that it has superior title because Realty knew that Mr. Padron did not have the authority to sell the warehouse without the

6. As Ms. Padron repeatedly alleged in her deposition, the sale of the warehouse was unauthorized and invalid because Mr. Padron needed her consent, but never got it. Padron Depo. at 121, 126, 129.

7. I reject Realty's argument that under Fed. R Evid. 1002 (best evidence rule) PWC could not generally try to prove the existence (and terms) of the shareholders' agreement through the oral testimony of Ms. Padron. We are at the summary judgment stage, so I

must credit Ms. Padron's testimony that the agreement was lost or destroyed by Mr. Padron. In such a circumstance, Fed.R.Evid. 1004 allows the contents of a document to be proved by secondary evidence, including oral testimony. *See Klein v. Frank*, 534 F.2d 1104, 1107–08 (5th Cir.1976). Nevertheless, as explained above, PWC has failed to present evidence to get to a jury on whether the shareholders' agreement had a consent clause.

consent of PWC's other shareholders, including Ms. Padron. PWC responds that its quiet title claim is not based on fraud by Realty; PWC says that Mr. Padron committed fraud individually, and that as a result title did not pass to Realty.[8] Specifically, PWC argues that Mr. Padron committed forgery by signing the corrected deed on behalf of PWC, and says that its quiet title claim is governed by a 20–year statute of limitations, *see* Fla. Stat. § 95.231 (quiet title), or a seven-year statute of limitations, *see* Fla. Stat. § 95.12 (recovery of real property).

I agree with Realty. Regardless of what labels PWC places on its claims, those claims are based on fraud, a fraud which Realty is alleged to have conspired and participated in. The amended complaint alleges (and Ms. Pardon testified, *see, e.g.,* Padron Depo. at 182), that Mr. Padron set out to sell the warehouse on his own and for his own benefit, that Realty knew or should have known about Mr. Padron's inability to sell the warehouse on behalf of PWC without Ms. Padron's consent,[9] and that Realty was able to buy the property at a below-market price. What the Fifth District said about the true nature of a similar claim is appropriate here:

The lawsuit here ... is not founded on a duly recorded instrument. The plaintiff

calls it a quiet title suit, but it is not. It is a shareholders derivative suit to cancel a deed fraudulently transferred. That is a lawsuit founded on fraud or other tortious misconduct. It is a suit by an individual as corporate shareholder, on his behalf and on behalf of the corporation to correct the misdeeds of the corporate directors, officers, or employees. While it seeks to correct the misconduct which incidentally involves a deed, it is not founded upon the deed itself.

*Mohican Valley, Inc. v. MacDonald,* 443 So.2d 479, 481 (Fla. 5th DCA 1984) (*en banc*). A similar analysis was used by the First District in *Steigman v. Danese,* 502 So.2d 463, 470 (Fla. 1st DCA 1987) ("Although Counts I, II, and III are equitable actions for cancellation of deeds, and resulting and constructive trusts upon real property, the claims are founded upon misrepresentations and fraud. Thus, these counts, with Count IV, are controlled by the section 93.11(3)(j) 4–year period."), *disapproved on other grounds, Spohr v. Berryman,* 589 So.2d 225, 229 (Fla.1991).

PWC argues, however, that Mr. Padron committed forgery by signing the corrected deed on behalf of PWC. Citing to *Moore v. Smith–Snagg,* 793 So.2d 1000 (Fla. 5th DCA 2001), PWC says that the

**8.** PWC's arguments are confusing. Though purportedly disclaiming fraud on the part of Realty, PWC argues that Realty had "actual and implied knowledge [that Mr.] Padron lacked corporate authority due to the requirement of [Ms.] Padron's consent to any transfer of the warehouse." PWC's Memo. at 5. At the very least, PWC contends that Realty was guilty of misconduct and of conspiring with Mr. Padron to effect the unlawful sale of the warehouse.

**9.** There are, as noted earlier, serious hearsay problems with some of Ms. Padron's testimony (e.g., what Mr. Padron told her about

anyone else's knowledge or involvement), but for now the important point is that PWC alleges involvement by Realty in Mr. Padron's fraudulent scheme. *See, e.g.,* Amended Complaint at ¶ 15 ("Realty Associates also knew that C.J. [Mr. Padron] did not intend to give [Ms. Padron] notice of the sale and intended to personally abscond with all of the net sale proceeds."), and ¶ 20 ("C.J. [Mr. Padron] and Realty Associates had conspired to consummate the sale agreement and closing without notice to minority shareholders.").

four-year statute of limitations for fraud does not apply. In *Moore*, the Fifth District held that, in the case of a truly forged deed—that is, a deed in which one person signed as if she were another— § 95.11(3)(j) does not apply because a forged deed is void ab initio and cannot transfer title. *See id.* at 1001. But, unlike the situation in *Moore*, there is no forgery. Mr. Padron signed his own name, and not anyone else's, on the purchase agreement and the deed. The fact that Mr. Padron allegedly did not have the authority to bind PWC in this transaction does not make his genuine signature a forgery. Florida law, both statutory and decisional, is that forgery requires the making of a writing that falsely purports to be the writing of another, with intent to defraud. *See, e.g.,* Fla. Stat. § 831.01; *Watkins v. State,* 826 So.2d 471, 474 (Fla. 1st DCA 2002). In fact, the Florida Supreme Court has agreed with the decisions of other courts that the "false assertion of authority ... to sign [one's] name as agent ... is not forgery." *Green v. State,* 76 So.2d 645, 647 (Fla.1954). *See also Hepburn v. Chapman,* 109 Fla. 133, 149 So. 196, 202 (1933) (forgery is "the false making or material alteration, with intent to defraud, of any writing which, if genuine, might apparently be of legal efficacy or the foundation of a legal liability.").

Accordingly, PWC's claims, which are in reality claims "founded upon fraud," are dismissed as time-barred under § 95.11(3)(j).

## C. RESCISSION AND RETURN OF PURCHASE PRICE TO REALTY

■ Realty also asserts that even if PWC's claims are not barred by the fraud statute of limitations, and even if Mr. Padron sold the warehouse without the required consent of Ms. Padron, PWC cannot survive summary judgment. According to Realty, PWC cannot obtain title to the warehouse without rescinding the purchase agreement and giving Realty back the purchase price. Realty also says that any claim for rescission would be time-barred because it is beyond the applicable four-year statute of limitations. *See* Fla. Stat. § 95.11(3)(1). PWC, on the other hand, notes that Realty did not initially cite any authority for its contention that rescission is required, and says that Realty can go after Mr. Padron any losses resulting from giving the warehouse to PWC.

In its reply memorandum, Realty cites to language in a Third District opinion, *Fineberg v. Kline,* 542 So.2d 1002, 1004 (Fla. 3d DCA 1988): "Based on equitable principles, once a party accepts the proceeds and benefits of a contract, that party is estopped from renouncing the burdens the contract places upon him." If that were the only Florida law on the subject, I might agree with PWC, but it is not.

In *Hobbs v. Hodges,* 101 Fla. 684, 135 So. 140 (1931), shareholders of Padgett Lumber Company filed a bill seeking to cancel certain mortgages that were executed by Padgett, the president of the corporation, in the name of the corporation. The bill, and the exhibits attached, showed that the defendant, Hodges, had advanced money to Padgett so that Padgett Lumber could operate its lumber business, and Padgett executed mortgages on certain corporate property to secure the loans. The shareholders alleged that Padgett's actions were ultra vires because the corporation's bylaws required that all written contracts entered into on behalf of the corporation had to be signed by both the president and the secretary and sealed

with the corporate seal. *Id.* at 141–42. The trial court dismissed the bill, and the Florida Supreme Court affirmed:

> There is no offer or tender in the bill of complaint to repay to Hodges the amount advanced to Padgett Lumber Company. There is no offer or tender to place the parties in status quo. Neither W.W. Padgett nor Padgett Lumber Company, a corporation, is made a party to the suit. *There is no allegation in the bill to show that Padgett Lumber Company did not receive the full benefits of all the contracts sought to be canceled.*

*Id.* at 142 (emphasis added).

As in *Hobbs*, PWC alleges that an act by a corporate president—the sale of the warehouse by Mr. Padron—was invalid because it violated a provision in the company's governing documents requiring the consent or approval of another person (i.e., the clause in the shareholders' agreement requiring Ms. Padron's consent). Although Ms. Padron testified that Mr. Padron kept the proceeds of the sale, there is no evidence that Realty paid Mr. Padron the $4.75 million directly (as opposed to paying it to PWC). In fact, PWC alleges in its amended complaint that it was paid the proceeds by Realty, and that Mr. Padron later transferred the funds to himself. *See* Amended Complaint at ¶ 21.[10] Mr. Padron may have subsequently pilfered the funds from the coffers of PWC, but that does not mean that PWC did not initially receive the benefits of the sale. Under *Hobbs*, PWC cannot survive summary judgment unless it offers to pay Realty back the purchase price and put Realty back in the position it held in 1995. It has not done so.

### D. Fla. Stat. § 692.01

There is another reason why PWC's claims fail. Under Fla. Stat. § 692.01, any corporation "may execute instruments conveying . . . any interest in lands by instruments sealed with the common or corporate seal and signed in its name by its president or any vice president or chief executive officer. . . No corporate resolution need be recorded to evidence the authority of the person executing the deed, mortgage, or other instrument for the corporation, and an instrument so executed shall be valid whether or not the officer signing for the corporation was authorized to do so by the board of directors, in the absence of fraud in the transaction by the person receiving it." As explained by the Third District, "any instrument executed in accordance with [§ 692.01] is deemed valid as against third parties even though the officer was without authority to enter into the transaction, unless there was fraud by the person receiving it." *Ocean Bank of Miami v. Inv–Uni Investment Corp.*, 599 So.2d 694, 695 (Fla. 3d DCA 1992). As explained above, PWC has not presented any admissible evidence that Realty engaged in fraud, so if the statute applies, the documents signed by Mr. Padron to convey the warehouse to Realty are valid. This is not a case like *Radison Properties, Inc. v. Flamingo Groves, Inc.*, 767 So.2d 587, 590 (Fla. 4th DCA 2000), where mortgagees were not entitled to the protections of § 692.01 because the individual who transferred the corporation's property was no longer an officer of corporation at time of the transfer.

PWC argues that § 602.01 does not apply because the deed did not contain

---

**10.** There is evidence that PWC made one direct payment to Mr. Padron, but that was only for $5,000. *See* Whalen Depo. at 36.

PWC's corporate seal, and therefore this document was not executed in accordance with the statute. PWC also argues, quoting *Snead v. United States Trucking Corp.*, 380 So.2d 1075, 1079 (Fla. 1st DCA 1980), that the statute was meant to apply to third parties "without knowledge of intra-corporate disputes," and points out that Realty knew about the dispute after Ms. Padron complained about the sale. Finally, PWC argues that at the very least Realty had "implied actual notice" of the problem because there was no corporate seal, the minority shareholders could not have had the time to object, and the sale was for a below-market price. *See, e.g., Crown General Stores, Inc. v. Ultra Meat Mkt.*, 843 So.2d 287, 289–90 (Fla. 3d DCA 2003) ("Implied actual notice has been defined as 'notice inferred from the fact that the person had means of knowledge, which it was its duty to use and which he did not use.' The principle behind this notice is 'that a person has no right to shut his eyes or ears to avoid information, and then say that he has no notice; that it will not suffice the law to remain willfully ignorant of a thing readily ascertainable by whatever party puts him on inquiry, when the means of knowledge is at hand.' "). I disagree, and conclude that § 692.01 applies given the evidence in this record.

First, the fact that the deed did not have PWC's seal does not negate the applicability of § 692.01. In relevant part, Fla. Stat. § 689.01 allows a corporation to convey property under seal or in the presence of two subscribing witnesses, and further states that conveyance may be made under § 689.01 or § 692.01. Here the deed was signed by two witnesses. But even if § 689.01's method is not available or somehow does not apply, § 692.01 is not limited to deeds; it includes any documents conveying an interest in land, so as long as a

document conveying an interest in land is under seal, the statute is satisfied. Here the purchase and sale agreement—which passed title to the warehouse and was binding between PWC and Realty, *see Licata v. De Corte*, 50 Fla. 563, 39 So. 58, 59 (1905) ("While the deed from Leto to De Corte was not recorded until after the decree of sale, it was yet good as between the parties thereto, and was also good as to others who had notice thereof.")—states that is "under seal." *See* Realty Statement of Facts, Tab A, Exh. 6 at 27. Furthermore, even if the deed was essential, the Florida Supreme Court has held that a deed without a seal still transfers equitable title. *See Harris v. Zeuch*, 103 Fla. 183, 137 So. 135, 139 (1931) ("If the instrument [a deed] was defective for want of a seal, and therefore insufficient to convey a legal title to the land, it passed equitable title thereto[.]").

Second, as noted above, there is no direct evidence—Mr. Padron's statements to Ms. Padron about Realty being hearsay—that Realty acted fraudulently (i.e., knew that Ms. Padron's consent was needed before Mr. Padron could sell the warehouse). The additional circumstantial evidence cited by PWC is also not enough to create an issue of fact as to whether there was fraud on Realty's part for purposes of § 692.01. For example, as explained earlier, *see* footnote 3, there is no evidence that Realty had a 1994 appraisal valuing the warehouse around $6 million, and hence no evidence that Realty was buying the property well below market value.

Third, although PWC is right that the timing of Mr. Padron's certificate under Fla. Stat. § 607.1202 should have indicated to Realty that the minority shareholders did not have the requisite 10–day statutory notice to object, that does not suggest (or

create a triable issue) that Realty was guilty of fraud so as to negate § 692.01. This is because § 607.1202 does not provide for after-the-fact relief against a third-party purchaser. Indeed, subsection (4) of the statute provides that dissenting shareholders have only the right to be paid the value of their shares. Furthermore, Fla. Stat. § 607.1302(5)—as it existed at the relevant time—stated that a shareholder entitled to dissent could not "challenge the corporate action ... unless the action is unlawful or fraudulent with respect to the shareholder or the corporation." For the reasons previously stated, PWC has not presented sufficient evidence to create a jury issue that the shareholders' agreement contained a clause requiring Ms. Padron's consent for the sale of the warehouse, and there is also insufficient evidence on this record to create an issue of fact as to whether Realty conspired with Mr. Padron's fraudulent scheme. Fourth, the "good faith purchaser" issue (raised by PWC's claim that Realty was aware of intra-corporate disputes) applies only to a subsequent transaction where there is fraud in the initial transaction. To the extent that PWC relies on the filing of a corrective deed by Realty on April 11, 1995, that reliance is misplaced, because it does not show pre-conveyance knowledge of Mr. Padron's scheme or fraud on Realty's part.

## E. Quiet Title and Ejectment Claims

On this record PWC has not created a triable issue of fact on its equitable quiet title claim. Realty is therefore entitled to summary judgment on that claim.

Florida courts have long held that in a suit to quiet title, the plaintiff "must rest upon the strength of her own title, and upon the lack of right in the opposing party; and she must show documentary title or title by adverse possession, and that she is actually or constructively in possession of the land[ ], or at least that the opposing party is not in possession." *Brickell v. Trammell,* 77 Fla. 544, 82 So. 221, 229 (1919). *See also Day v. Benesh,* 104 Fla. 58, 139 So. 448, 451–52 (1932) (same); *McLemore v. McLemore,* 675 So.2d 202, 206 (Fla. 1st DCA 1996) (same). Here it is undisputed that Realty is in possession of the warehouse. *See* Amended Complaint at ¶ 40. It is also undisputed, as Ms. Padron testified, that PWC does not have documentary title to the warehouse, or a deed to the warehouse. *See* Padron Depo. at 122.

The same result obtains for PWC's ejectment claim. Under Florida law, a party seeking ejectment must, among other things, establish that it has title. *See Mobley v. Hunt,* 722 So.2d 248, 249 (Fla. 2d DCA 1998). Again, it is undisputed that PWC does not have title to the warehouse.

## F. Declaratory Judgment and Constructive Trust

Realty, as explained above, is entitled to summary judgment on PWC's quiet title and ejectment claims. Because PWC is not entitled to obtain title to the warehouse, it is not entitled to a declaratory judgment that it is the rightful owner of the warehouse. Realty is entitled to summary judgment on this claim as well.

This leaves PWC's constructive trust claim. Whether one views constructive trust as and independent claim with substantive elements, *see Saporta v. Saporta,* 766 So.2d 379, 381 (Fla.App.3d DCA 2000) ("To impose a constructive trust, there must be (1) a promise, express or

implied, (2) transfer of the property and reliance thereon, (3) a confidential relationship, and (4) unjust enrichment."), or as an "extraordinary" equitable remedy that must be based on "an established cause of action," *Collinson v. Miller*, 903 So.2d 221, 228 (Fla. 2d DCA 2005), Realty is entitled to summary judgment. PWC did not transfer the warehouse based on any promise that Realty did not keep, and Realty has not been unjustly enriched. Alternatively, PWC has not been able to sustain any of its claims, and therefore cannot obtain the equitable remedy of a constructive trust.

### IV. PWC'S MOTION FOR DEFAULT JUDGMENT AGAINST MR. PADRON

■ PWC seeks default judgment against Mr. Padron. PWC served Mr. Padron with its initial complaint, but did not serve him with the amended complaint. On this record, I conclude that PWC is not entitled to a default judgment against Mr. Padron.

Under *Varnes v. Local 91*, 674 F.2d 1365, 1368–70 (11th Cir.1982), a defaulting defendant must be served with an amended complaint that contains a new claim or seeks different relief, whether or not the defendant subsequently seeks to prevail on that claim or obtain that relief. The initial complaint did not have any specified counts but sought recovery of the warehouse on the theory that the sale by Mr. Padron was fraudulent and a sham. The amended complaint, in contrast, has four counts (quiet title, ejectment, declaratory judgment, and constructive trust). Although the two complaints seek the same relief against Mr. Padron—return of the warehouse—the amended complaint clearly contains a "new and additional claim for relief" against Mr. Padron: a claim for declaratory relief. Because PWC has not served Mr. Padron with the amended complaint, it is not entitled to a default judgment. And because Mr. Padron is living abroad, and has not been served with the amended complaint in the almost three years since its filing, dismissal of the claim against Mr. Padron is appropriate under Rule 4(m).

Even if I considered only the initial complaint—on the theory that the amended complaint is effective as to Mr. Padron only when he is served with it, *cf. Int'l Controls v. Vesco*, 556 F.2d 665, 668–69 (2d Cir.1977) (generally amended complaint supersedes initial complaint only upon service)—default judgment still would not be appropriate. Although the initial complaint alleges that Mr. Padron absconded with the proceeds of the sale, *see* Initial Complaint at ¶ 23—proceeds that belonged to PWC—and such an allegation would normally be enough to impose liability for theft or conversion on Mr. Padron, PWC sought monetary relief against him. The initial complaint seeks only the return of the warehouse. Because Mr. Padron is not in possession of the warehouse, I could not grant PWC any such relief against him. *See Nishimatsu Const. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1975) ("there must be a sufficient basis in the pleadings for the [default] judgment entered," and propriety of relief sought against defaulting defendant is not assumed).

### V. REALTY'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY ON ITS BREACH OF CONTRACT COUNTERCLAIM

Under ¶ 14.1.2 of the sale and purchase agreement, PWC agreed to "indemnify and hold [Realty] harmless from and against all acts of [PWC]" with respect to

"all reasonable costs and expenses incurred by [Realty] in connection with any action, suit, proceeding, demand, assessment, or judgment incident to any of the matters indemnified in [¶] 14.1.1, in which [Realty] is the prevailing party." In turn, ¶ 14.1.1 refers in relevant part to "any representation or warranty of [PWC] contained in this agreement ... found to be false in any material respect."

There is also a separate provision, ¶ 17.16, which Realty relies on. Entitled "Prevailing Party," it provides that, "should either party [PWC or Realty] employ an attorney to enforce any of the provisions hereof (whether before or after closing, and including any claims or actions involving any amounts held in escrow), or to recover damages for the breach of this agreement, the non-prevailing party in any final judgment agrees to pay the other party's reasonable expenses, including attorneys' fees and expenses in or out of litigation and, in litigation, trial, appellate, bankruptcy, or other proceedings, expended or incurred in connection therewith, as determined by a court of competent jurisdiction."

Realty argues that, if it is found to be the prevailing party on PWC's claims, it is entitled to be indemnified for its attorneys' fees and expenses in this case and in the prior federal action brought by Ms. Padron. *See Padron v. The Realty Associates Fund III,* No. 01–1919–Civ–Jordan (dismissed with prejudice on statute of limitations grounds). PWC responds that it was not a party in Ms. Padron's prior action, and that none of the indemnification provisions have been triggered or are applicable.

 ¶ 14.1.2. As an initial matter, Realty is not entitled to recover attorneys'

fees under ¶ 14.1.2. The relevant language in that paragraph is "costs and expenses," and such language is not broad enough under Florida law to include attorneys' fees. *See Tobias Knoblauch Private Bank v. Southern Aero Traders, Inc.,* 443 So.2d 202, 203–04 (Fla. 3d DCA 1983). *See also Price v. Tyler,* 890 So.2d 246, 251–52 (Fla.2004) (term "costs" does not include attorneys' fees); *Wiggins v. Wiggins,* 446 So.2d 1078, 1079 (Fla.1984) (same). One of the cases cited by Realty, *Natco Ltd. v. Moran Towing,* 267 F.3d 1190, 1193–94 (11th Cir.2001), is distinguishable on two grounds. First, it is an admiralty case involving federal law, and not Florida law. Second, the language in that case ("any and all loss, damage, or liability") is broader than the language in ¶ 14.1.2. The other case cited by Realty, *Shannon v. Kaiser Aluminum,* 749 F.2d 689, 690–91 (11th Cir.1985), is closer, but not close enough. *Shannon* holds that, under Florida law, a general indemnification clause includes attorneys' fees even though such fees are not specifically mentioned. Here, however, there is no general indemnification clause. Instead, ¶ 14.1.2 uses the "costs and expenses" language which Florida courts have held does not include attorneys' fees. Parties should be held to their contractual agreements, and here the parties chose to limit indemnification under ¶ 14.1.2 to "costs and expenses." It is also significant that the parties knew how to provide for an award of attorneys' fees in the agreement when they wanted. For example, in ¶ 17.16 (discussed below) the parties included an attorneys' fee provision for the prevailing party in litigation between them.

 This does not get PWC completely off the hook under ¶ 14.1.2. Contrary to what PWC argues, that paragraph's lan-

guage ("any action") is not limited to cases in which PWC is a party, and instead is broad enough to cover actions by third parties (even related third parties like Ms. Padron). Accordingly, Realty, the prevailing party in Ms. Padron's prior federal action—an action in which PWC's conduct was challenged—can generally recover its costs in that action from PWC (but not its attorneys' fees), as long as ¶ 14.1.1 is satisfied.

Unfortunately for Realty, Ms. Padron's prior action does not satisfy ¶ 14.1.1. Under ¶ 14.1.1, a "representation or warranty" made by PWC must be "found to be false in any material respect." In Ms. Padron's prior action there was no "finding" by a jury or a court that any of PWC's representations or warranties were materially false. In summary, then, after going through this contractual analysis, Realty cannot recover its attorneys' fees and costs from PWC under ¶ 14.1.2.

 ¶ 17.16. On the other hand, Realty is entitled to attorneys' fees under ¶ 17.16, but only for this case, and not Ms. Padron's prior action. First, unlike ¶ 14.1.2, this provision expressly includes attorneys' fees, so such fees are generally recoverable. Second, I agree with PWC that the natural reading of ¶ 17.16 is that it only applies in legal actions between Realty and PWC, for in such actions one of the parties might seek to enforce contractual provisions, and the parties could not enforce such provisions against litigants who are not bound by the agreement. In addition, ¶ 17.16 is entitled "Prevailing Party," and if this paragraph applied to third-party actions then the indemnification language in ¶ 14.1.2 would be superfluous. This means that Realty can recover its attorneys' fees and costs in this case, but not in Ms. Padron's prior action, where PWC was not a party.

In this action, Realty has clearly had to "employ an attorney to enforce ... the provisions" of the agreement, and Realty is now the prevailing party. Under ¶ 17.16, then, Realty is entitled to its reasonable attorneys' fees and costs in this case from PWC.

PWC also argues (without any authority) that ¶ 17.16 is completely inapplicable because under ¶ 17.18 the agreement was null and void, as it was not signed by Realty until three days after the cut-off of March 24, 1995. This argument fails because PWC elected to pursue the agreement, proceeded to closing, executed various documents (the warranty deed, a blanket conveyance, etc.), and accepted the benefits of the agreement (i.e., the proceeds of $4.75 million) before Mr. Padron absconded with them. In other words, PWC waived any time limit for acceptance. *See generally Walker v. Benton*, 407 So.2d 305, 306 (Fla. 4th DCA 1981).

## VI. CONCLUSION

Realty is entitled to summary judgment on all of PWC's claims. Realty is also entitled to summary judgment on liability on its breach of contract counterclaim, as follows: under ¶ 14.1.2 of the agreement, Realty is not entitled to recover its attorneys' fees and costs; under ¶ 17.16, Realty is entitled to recover its reasonable attorneys' fees and costs in this action (but not Ms. Padron's prior action) from PWC.

**The parties are to notify me by July 27, 2005, whether they have been able to resolve what amounts Realty is entitled to recover from PWC under ¶ 17.16. If they have not been able to agree, they shall provide available dates for a trial and indicate whether they wish a trial**

before a jury or a bench trial. The parties are advised that in mid-August I begin a 4–6 week criminal securities fraud trial, and October I begin a 4–6 month criminal bank fraud trial.

PWC's motion for default judgment against Mr. Padron is denied. Because PWC did not serve the amended complaint on Mr. Padron, the claims against Mr. Padron are dismissed without prejudice under Rule 4(m). Alternatively, PWC's motion for default judgment against Mr. Padron is denied because the only relief requested by PWC in its initial complaint—the only complaint served on Mr. Padron—is delivery and possession of the warehouse. Such relief is not available against Mr. Padron, who is not in possession and does not have title.

Final judgment will be entered once the issue of Realty's attorneys' fees and costs is resolved.